## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DORIS R COCHRAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-1121 |
| | ) | |
| SMITH & NEPHEW, INC., | ) | |
| | ) | |
| Defendant. | ) | |

# ORDER AND OPINION

This matter is now before the Court on Defendant's [17] Motion for Summary Judgment.

For the reasons set forth below, Defendant's Motion [17] is GRANTED.

### BACKGROUND

On May 8, 2014, Plaintiff Doris Cochran filed a products liability action against

Defendant Smith & Nephew, Inc. ("SNI") and four other affiliates in the Circuit Court of the

Tenth Judicial Circuit in Tazewell County, Illinois. On June 30, 2014, Defendants removed the

action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446. See *Cochran v. Smith & Nephew,*

*Inc.*, No. 14-1264 (C.D. Ill. 2014). This Court had subject matter jurisdiction over the action

because there was complete diversity of citizenship among the parties. See 28 U.S.C. § 1332. On

August 15, 2014, Plaintiff voluntarily dismissed all Defendants except SNI, and on April 29,

2015, this Court granted Plaintiff's motion to voluntarily dismiss "in accordance with the record

made by Defendants in their response."[1]

---

[1] The relevant portion of SNI's response stated that "[i]n the event Ms. Cochran refiles her lawsuit, Smith & Nephew, Inc. requests that discovery be stayed and the very first and initial matter to be addressed by the Court be the statute of limitations issue."

The instant action was filed by Plaintiff on April 21, 2016, naming SNI and Neubauer Perkins, Inc. ("NPI") as Defendants. Counts 1 and 2 of the Complaint stated claims of strict and negligent product liability against SNI. Because Plaintiff and NPI were both alleged to be citizens of Illinois, the Court ordered Plaintiff to file an amended complaint alleging an adequate basis for this Court's jurisdiction. See 28 U.S.C. § 1332(a); Doc. 2. On May 4, 2015, instead of amending the Complaint, Plaintiff filed a motion to remand. The Court denied that motion on September 15, 2016, and gave the Plaintiff leave to amend her Complaint to remedy the jurisdictional defect by removing NPI. Doc. 14. After Plaintiff amended her Complaint, SNI, the only remaining Defendant, filed a Motion for Summary Judgment (Doc. 17), to which Plaintiff has responded (Doc. 24).

The parties agree that the following, taken from Defendant's statement of undisputed material facts, are not in dispute. See Doc. 17, at 2-5. On September 16, 2009, Plaintiff Cochran underwent a right hip arthroplasty by orthopedic surgeon Donald Mitzelfelt, M.D. Doc. 17-1, at 18, 60 (Cochran Dep.). During that procedure, Dr. Mitzelfelt implanted the device at issue—the Smith & Nephew R3 Acetabular System with R3 Metal Liner—into Ms. Cochran's right hip. *Id.* at 18. On July 4, 2010, Plaintiff injured her hip (*Id.* at 82), and on November 18, 2010, Plaintiff underwent a revision surgery on her right hip. *Id*. at 90. Dr. Mitzelfelt removed the implant at issue and replaced it with another hip prosthesis. *Id.*

Three and a half years later, on May 8, 2014, Plaintiff filed her original complaint against Smith & Nephew in the Circuit Court of Tazewell County. Doc. 17-2. On June 30, 2014, Smith & Nephew removed plaintiff's state court lawsuit to this Court. *Id.* at 12. Following removal, discovery commenced, and on April 21, 2015, defense counsel deposed Plaintiff. See Doc. 17-2. One day after her deposition, on April 22, 2015, the Plaintiff filed her Motion for Voluntary

Dismissal. See Doc. 17-3. SNI filed a Response to Plaintiff's Motion for Voluntary Dismissal, acknowledging its agreement to the dismissal in order to save costs and unnecessary expenses, but requesting that: "In the event Ms. Cochran refiles her lawsuit … discovery be stayed and the very first and initial matter to be addressed by the Court be the statute of limitations issue." Doc. 17-4. On April 29, 2015, the Court granted Plaintiff's Motion for Voluntary Dismissal "in accordance with the record made by Defendants in their response." See 4/29/15 Text Order, Doc. 17-5.

After Plaintiff refiled her complaint on April 21, 2016 and the motion to remand was denied, Plaintiff filed the current Amended Complaint on September 28, 2016. See Plf's Am. Comp, Doc. 17-6. Plaintiff's Amended Complaint contains four counts against Smith & Nephew for strict product liability, negligent product liability, breach of implied warranty, and breach of express warranty.[2] On October 12, 2016, 2016, SNI filed its answer and affirmative defenses. Doc. 17-7.

Plaintiff disputes only two of the statements in Defendant's statement of undisputed facts. First, Plaintiff disputes she broke her hip on July 4, 2010, or that she knew she had a claim against SNI on that date. See Doc. 24, at 4 (Plf's Response). Second, Plaintiff disputes that she knew she had a claim when she requested to keep the explanted R3 Acetabular System and its R3 metal liner from her November 2010 revision surgery. *Id.* at 10-11.

**LEGAL STANDARD**

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is

---

[2] In response to Defendant's Motion for Summary Judgment, Plaintiff conceded that her warranty claims are barred by the statute of limitations. See Doc. 24, at 20. Therefore, only the product liability claims remain.

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as to the material facts,' summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. Thus, in order to overcome the undisputed facts set forth in a defendants' motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

## ANALYSIS

### (A) The Statute of Limitations for Products Liability Actions in Illinois

In Illinois, the statute of limitations for products liability actions is set forth in Section 13-213 of the Illinois Code of Civil Procedure. 735 ILCS 5/13-213. Subsection (d) provides, in relevant part, "the plaintiff may bring an action within 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, of the existence of the personal injury, death or property damage …" *Id.* "In applying the two-year statute of limitations set forth in section 13–213(d) and similar statutes of limitations, Illinois courts have adopted a 'discovery rule,' which serves to 'postpone the commencement of the relevant statute

of limitations until the injured plaintiff knows or reasonably should have known that he has been injured and that his injury was wrongfully caused.'" *Mitsias v. I-Flow Corp.*, 2011 IL App (1st) 101126, ¶ 21, 959 N.E.2d 94, 100 (citing *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 361 (1995)).

Illinois courts have elucidated the "wrongfully caused" standard of the discovery rule and distilled it down to two elements—cause and wrongfulness. *Mitsias*, 2011 IL App (1st) 101126, at ¶ 22. "With regard to the first element, plaintiff must have sufficient information to conclude that her injury was caused by the acts of another." *Id*. (citing *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 169 (1981)). Under the wrongfulness element, "an injured plaintiff should reasonably know that her injury is wrongfully caused, and the statute of limitations begins to run, as soon as she has sufficient information about her injury and its cause to spark inquiry in a reasonable person as to whether the conduct of the party who caused her injury might be legally actionable." *Id*. at ¶ 23 (citing *Knox,* 88 Ill.2d at 416, 58 Ill. Dec. 725, 430 N.E.2d at 980). However, "[k]nowledge of 'wrongful cause' does not require knowledge on the part of plaintiff that the defendant's conduct fits the technical legal definition of negligence or that all the legal elements of a particular cause of action are otherwise satisfied." *Id*. at ¶ 24. Rather, it requires "that the plaintiff is or should be aware of some possible fault on the part of the defendant …" *Id*.

**(B) Defendant's Statements of Fact and Plaintiff's Responses**

Here, Defendant asserts that Plaintiff knew she had a claim against SNI as early as July 4, 2010. In support, Defendant cites the following excerpt from Plaintiff's deposition testimony:

> Q. Now, you first realized you might have a claim against the manufacturer back when you thought this thing broke and then after the revision surgery and you asked to keep those parts, right?
> A. Yes.

Doc. 17-1, at 128.

Plaintiff's response states that "[t]he Plaintiff denies that this is an undisputed fact, denies that she broke her hip on July 4, 2010, and responds that there is a genuine issue of material fact as to what the Plaintiff knew, might have known, when she might have known, and the date on which she reasonably knew that she might have been injured and that the injury was wrongfully caused by the Defendant[] …" Doc. 24, at 4. In support, Plaintiff cites at length to other portions of her deposition transcript:

> Q. I would expect that you would have wanted to know from Dr. Mitzelfelt why this was that you had to go under and have a revision surgery?
> A. Yes.
> Q. What did he tell you?
> A. He found metal shavings in my body.
> …
> Q. Okay. And did you discuss with him that maybe there was something wrong with the product that caused those metal shavings?
> A. No.
> …
> Q. Did he tell you he did anything wrong?
> A. No.
> …
> Q. Or did he tell you that there was some defect in the product?
> A. No. (Doc. 17-1, at 50-52).
> …
> Q. The components that he ended up using, as you see, they're metal components. Did you have any conversation with Dr. Mitzefelt or anyone from his office about the risks and benefits of using metallic kinds of components before you had the surgery in September of 2009 on your right hip?
> A. No.
> Q. Did you do any independent sort of research on the hip replacement surgery you were going to have and then had in September of 2009 before you had the surgery?
> A. No.
> …
> Q. You didn't go out and research the product manufacturer yourself; you relied on Dr. Mitzefelt?
> A. Yes. (*Id*. at 68-70).
> …
> Q. Has Dr. Mitzelfelt told you that Smith & Nephew has got problems?
> A. No. (*Id*. at 121).
> …

Q. Okay. Has any physician, doctor expressed to you their opinion that there was something wrong with this product?

A. No. (*Id*. at 125).

…

Q. Ok. You've never spoken to anybody that's employed by Smith & Nephew I take it?

A. No. (*Id*. at 127).

…

Q. Did you ever write any claim letter or a letter of any type to Smith & Nephew to tell them that you've had a problem, other than the filing of this lawsuit?

A. No, I haven't. (pg. 127-128). (*Id*. at 121, 125, and 127-128).

…

Q. …What I want to know is if you can recall any discussions with Dr. Mitzelfelt about what was causing the specific metal shavings or metal debris that he said he found. Do you remember having any conversations with him as to, did he ever offer any explanations is what I'm asking, as to why he believed that was occurring?

A. He didn't know until he got in there or they did the test and found the black stuff in there with the metal shavings in it. He didn't know anything was going on.

…

Q. Right, I understand that. What I'm trying to ask is if you remember having any conversations with him, Dr. Mitzefelt, where he told you, and this is just an example Doris, I think the reason why there are metal shavings is because dot dot dot? Do you remember having any kind of conversation like that?

A. No.

Q. Do you recall him ever mentioning to you that there was any type of a metal on metal contact within your specific implant? Do you remember having any conversations with him about metal on metal contact?

A. No.

Q. Did he have any conversations with you that you can recall about the types of components that he was going to put into you during that revision surgery, meaning he was going to use metal on metal, he was going to use metal on plastic ceramic? Do you have any recollection of those kind of—

A. He didn't tell me anything. (*Id*. at 147, 148-149).

…

Q. Okay. Earlier counsel had asked you a question and used a very specific working to that question, and that was he said to you that July 4th, 2010, when you had this incident is when you realized that you had a claim, and what I want to know is on July 4, 2010, your testimony is that you thought your hip replacement parts had broken. Did you have any formulation of any opinion at that point in time that the reason it was broken was because of some manufacturing defect with the implant?

A. I did not know.

Q. Did you formulate any opinion as to whether or not it broke because of some body motion that you made; i.e., the bending over or having your leg in a position that caused what you believed to be a break?

A. No.

Q. So really would you agree with me that at least as of July 4, 2010, you really had no idea what the possible cause of this breakage that you thought you'd experienced in your hip, correct?

A. I had no knowledge of it.

Q. Right, and even as of when you hired this other law firm in California and eventually you hired our office, you still had real – you'd agree with me that you had no real understanding of what had caused these issues with your right hip implant, correct?

A. Correct.

Q. You'd never had any conversations with Dr. Mitzefelt about the specific –

A. No.

Q. -- cause of those metal shavings or the black fluid?

A. No.

Q. And even today would you agree with me that you only have a very limited understanding of the cause of those conditions, meaning the shavings and the black fluid, correct?

A. That's right. (*Id*. at 149-151).

…

Q. This July 4, 2010 incident, you through that there was a break in your implant, correct?

A. Yes.

Q. But what you came to understand through your visits with Dr. Mitzelfelt and the x-rays that we talked about was the fact that there wasn't actually anything broken, was there?

A. No. I don't guess.

Q. Well, when they took the components out and you've seen them, Dr. Mitzelfelt never told you that, hey, these are broken, that was the problem, right?

A. He never told me that. —

Q. And so what I said earlier about knowing what was actually causing the black fluid that we talked about, the metal shavings and the actual need for the revision had nothing to do with a broken component, correct?

A. I don't know how to answer that.

Q. Sure. As far as you know –

A. As far as I know.

Q. Again you've never been told by anybody, including your physician that did the surgery, that the components were broken or that this perceived breaking that you experienced on the 4th of July, 20410 was actually the cause or the need to have the revision surgery, correct?

A. Correct. (*Id*. at 154-155).

Defendant also asserts that Plaintiff knew she had a claim after her revision surgery because she kept the explanted prosthesis in her freezer. In support, Defendant cites to the following excerpt from Plaintiff's deposition testimony:

> Q. Okay. Now, I think that you at some point came into possession of the components we were just looking at at the beginning. When did you get those and from who?
> A. After I had the second one done, my daughter is a surgery nurse and I told her I wanted them, and she kept them.
> …
> Q. All right. And did you tell her before the surgery that you wanted those?
> A. Yes.
> Q. Why?
> A. In case I ever needed them.
> …
> Q. Either way you knew at the time in 2010 that you wanted to hang on to that component for the future?
> A. Well, I'd heard there was problems with some of them and I thought if I had that, I would have proof there was problems.
> Q. Okay. What did you do with it? Where did it go after the surgery? I mean where was it kept?
> A. At my house.
> Q. In the same packaging it's in now?
> A. Yeah.
> Q. Sort of a Ziploc baggie, right?
> A. Yes.
> Q. With a paper towel in there?
> A. Yes.
> Q. And it just sat in your house?
> A. In the freezer.
> Q. Oh, you kept it in the freezer?
> A. Yeah.
> Q. All right. Until when?
> A. Now.
> Q. You just brought it today?
> A. Yes.
> Q. So you've had it stored in a freezer consistently since the surgery for the reasons that you already discussed with me?
> A. Yes.
> …
> Q. Okay. And so from the surgery date of November 18th, 2010, until you hired that first firm in 2013, you just held on to those things in your freezer?
> …
> A. That's correct. (*Id.*at 48, 50, 52-54, 130).

Finally, Plaintiff's response states:

> The Plaintiff denies that she knew that she had a claim prior to the revision surgery, denies that she knew she had a claim at the time of revision, denies that the subject R3® Acetabular System and its R3® metal liner were broken in July, 2010, denies that the subject R3® Acetabular System and its R3® metal liner were broken when they were explanted from the Plaintiff, and denies that she knew she had a claim when she requested to keep the explanted R3® Acetabular System and its R3® metal liner. As stated above, in the Plaintiff's RESPONSE to paragraph 7, the Plaintiff denies that this is an undisputed fact, and responds that there is a genuine issue of material fact as to what the Plaintiff knew, might have known, when she might have known, and the date on which she reasonably knew that she might have been injured and that the injury was wrongfully caused by the Defendants, SMITH & NEWPHEW, INC. and NEUBAUER PERKINS, INC. See Exhibit C at pgs. 50-52, 68-70, 121, 125, 127-128, 147, 148-149, 149-151, and 154-155.

**(C) Plaintiff has not Established a Genuine Dispute of Material Fact**

The first element of the discovery rule requires that a plaintiff have sufficient information to conclude that her injury was caused by the acts of another. *Mitsias*, 2011 IL App 101126, at ¶ 22. Here, Ms. Cochran testified that on July 4, 2010 "I went out back and I bent over to do something and I felt it, something happen. I didn't know if I'd make it back in the house or not." Doc. 17-1, at 82. She went to the hospital the next day, and over the course of the next few months complained that her hip was "squeaking" *Id*. at 93. When her physician x-rayed her hip, "he found out that the thing wasn't in right, that it was slipped or something, so they said I needed to have some stuff drawn out of my hip, and when they did they found this black stuff that looked like motor oil and it was full of metal shavings, and he said I had to have it out." *Id*. at 51-52. She underwent revision surgery the next day, on November 18, 2010. *Id*. at 90. Thus, at a minimum, Ms. Cochran knew that her injury was caused by the acts of another by the time of her revision surgery on November 18, 2010; a fact she confirmed in her deposition. See Doc. 17-1, at 128 ("Q. Now, you first realized you might have a claim against the manufacturer back

10

when you thought this thing broke and then after the revision surgery and you asked to keep those parts, right? A. Yes.").

The second element of the discovery rule—wrongfulness—provides that "an injured plaintiff should reasonably know that her injury is wrongfully caused … as soon as she has sufficient information about her injury and its cause to spark inquiry in a reasonable person as to whether the conduct of the party who caused her injury might be legally actionable." *Id*. at ¶ 23. Here, Ms. Cochran testified that at the time of her November 2010 revision surgery, she wanted to keep the explanted hip replacement because, "I'd heard there was problems with some of them and I thought if I had that, I would have proof that there was problems." *Id*. at 53. To that end, she kept the explanted hip replacement in her freezer. *Id*. In sum, Plaintiff's own testimony established that by the time of her November 2010 revision surgery, she knew she had been injured, she knew that the cause of her injury was the Smith & Nephew hip replacement, and she knew that the explanted hip replacement would have evidentiary value in any future legal action. In other words, the two-year statute of limitations began to run by the time she had her November 2010 revision surgery.

"The point at which [an] injured person becomes possessed of sufficient information concerning his injury and its cause to trigger the running of the limitations period is usually a question of fact," but it becomes an issue of law where "the facts are undisputed and only one conclusion may be drawn from them." *Janetis v. Christensen*, 200 Ill. App. 3d 581, 586 (1990); *Guarantee Trust Life Ins. Co. v. Kribbs*, 2016 IL App (1st) 160672. Here, Defendant has pointed to evidence showing that Plaintiff knew she had a claim against SNI by November 2010. Plaintiff's response does not point to any evidence showing that Ms. Cochran did not mean what

she said. Thus, Plaintiff has failed to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Even if Plaintiff could establish an issue of fact regarding Ms. Cochran's actual knowledge, that issue would be insufficient to survive summary judgment. This is so because the inquiry under the discovery rule is an objective one—"the statute starts to run when a person knows *or reasonably should know* of his injury and also knows *or reasonably should know* that it was wrongfully caused." *Knox,* 88 Ill.2d at 414–15, 58 Ill. Dec. 725, 430 N.E.2d at 980 (emphasis added). Ms. Cochran was informed that her Smith & Nephew hip replacement required immediate removal because it was causing a "motor oil" like substance with metal shavings to accumulate in her body. Doc. 17-1, at 52. She also knew that Smith & Nephew was "having problems" with hip replacement components. *Id*. at 53. At this point, Ms. Cochran "should [have been] aware of some possible fault on the part of the defendant …" *Mitsisas*, 2011 IL App (1st) 101126, at ¶ 30. Accordingly, Defendant is entitled to summary judgment in its favor.

## CONCLUSION

For the reasons stated above, Defendant's [17] Motion for Summary Judgment is GRANTED.

This matter is now terminated.

Signed on this 22nd day of May, 2017.

<u>s/ James E. Shadid</u>
James E. Shadid
Chief United States District Judge